1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM STEWART NEELY,

11              Petitioner,              No. CIV-S-08-1416 WBS CKD  P

12       vs.

13   DIRECTOR, CALIFORNIA
     DEPARTMENT OF CORRECTIONS,          ORDER AND
14   et al.,

15              Respondents.             FINDINGS AND RECOMMENDATIONS

16   _____/

17              Petitioner is a state prison inmate proceeding pro se with a petition for a writ of

18   habeas corpus challenging his conviction in Sacramento County Superior Court of thirty-two

19   counts of child molestation and the resulting sentence of fifty-eight years to life.  CT 666-671.[1]

20   His petition contains eleven arguments: (1) violation of the statute of limitation applicable to

21   Counts 8 through 25 of the state court indictment and of the ex post facto clause; (2) ineffective

22   assistance of trial counsel; (3) ineffective assistance of appellate counsel; (4) consecutive

23   sentences unconstitutionally based on findings not made by the jury and not found beyond a

24   reasonable doubt; (5) violation of the applicable statute of limitations applicable to Counts 26

25   _____

26        [1] "CT" refers to the Superior Court Clerk's Transcript that is now on record in this court.
     "RT" refers to the court reporter's transcript.

                                        1

through 36 of the state court indictment; (6) insufficient evidence to convict petitioner of crimes committed by duress (Counts 1 and 3); (7) "[t]he prosecutor's deliberate misleading of the jury on the statute of limitations issue;" (8) violation of the Confrontation Clause; (9) insufficient evidence to convict petitioner of crimes against a minor under fourteen years old; (10) false or illegally obtained DNA evidence used against petitioner at trial; (11) improper imposition of the maximum term as to Counts 5 through 7, in violation of the applicable statute of limitations.  See Amended Petition at 5-6b.

I. Facts

When Kumcha Neely married petitioner she had three daughters:  Gina, born in 1982; Alicia, born in 1983, and Elizabeth, born in 1985.[2]  RT 65, 320, 398, 549.  Shortly after Kumcha and petitioner married, she and the girls moved to petitioner's house in Wilton.  RT 67, 320, 399, 596.  Alicia and Gina were given bedrooms upstairs, while Elizabeth's room was downstairs.  RT 93.  When Kumcha and the girls moved in, petitioner's son Billy lived in a downstairs bedroom.  He moved out in 1996, just before he got married.  RT 552-553.  There were also two sheds on the property.

Petitioner made rules for the household.  These included a ban on the girls' sleeping in each other's rooms or even visiting for long in each other's rooms and locking their doors at night.  RT 75, 101, 421, 569.  In addition, the girls were rarely allowed to have friends visit the house and were not allowed to date.  RT 75, 322, 381, 570.  After she got her cell phone, Alicia was required to check in with petitioner frequently.  RT 296, 571.  He would also call her. RT 252.  The other girls were also required to check in, but not as often.  RT 295, 571. Petitioner restricted their contact with their natural father, who lived in Arkansas.  RT 649.  They were generally scared to do something that would upset petitioner because he would yell at them. RT 322, 468.  Even so, the girls called petitioner "Dad," gave him loving cards for father's day

---

[2] The precise dates of birth have been omitted from this document for privacy reasons.

and told him they loved him.  RT 209, 463.

When Alicia was in the fifth grade, petitioner started having her sit on his lap or next to him on the couch when they watched television.  RT 406.  Once when they were watching television when Alicia was twelve or thirteen, he kissed her and tried to put his tongue in her mouth.  RT 76.  On another occasion when she was thirteen, when they were outside feeding the calves, petitioner succeeded in putting his tongue in her mouth and put his hand down the front of her pants.  RT 79, 81.  There were perhaps five other instances when petitioner kissed and touched her sexually when she was thirteen.  RT 83-84.  She did not tell anyone because she hoped it would all go away.  RT 82.

Petitioner first had intercourse with Alicia when she was thirteen.  RT 86.  He called her to his room, sat her on the bed, pushed her down and tried to take her pants off.  RT 87.  She held on to her pants, but he overpowered her and pulled them down.  RT 88.  He stuck his fingers into her vagina as he held her down with his other arm.  RT 89, 224.  He then put on a condom and put his penis in her vagina.  RT 89.  When it was over, she put her clothes back on, went into the bathroom crying, and threw up.  RT 90.

There were five other acts of intercourse in her parents' bedroom.  RT 90.  There were four or five acts of intercourse in her bedroom before she moved downstairs.  RT 99.  Every time petitioner would try to remove her pants and underwear, she would resist, and he would try harder.  RT 104.  At some point, petitioner engaged in oral copulation with Alicia; the first time was in her bedroom upstairs.  RT 99, 100.

Sometimes Gina could hear footsteps in Alicia's room at night, through the shared wall of their upstairs' bedrooms.  RT 409-410.  Sometimes petitioner would announce loudly that he was going to help Alicia with her homework and go into her room.  RT 412.  Gina then would hear nothing until petitioner would once again say something about homework and leave Alicia's room.  RT 412.  Gina thought it was odd that petitioner helped Alicia because they were all bright and Alicia did well in school.  RT 355, 411.  Petitioner helped Alicia with her homework,

3

1   but did not help Gina or Elizabeth.  RT 637.

2           Once, during the summer of 1997, petitioner asked Gina and Elizabeth to go

3   outside and feed the cats.  RT 403-404.  Gina looked in the window and saw petitioner putting

4   his tongue in Alicia's ear.  RT 404.  She never said anything because she "didn't know if what I

5   saw was really what I was seeing."  RT 405.

6           In 1997, the family began a lengthy remodeling project on the house, which

7   involved bumping up the roof line and adding a mudroom.  The plans were drawn up by the

8   girls' paternal great-grandfather, who also secured the permit for the remodeling in March 1997.

9   RT 556-560.  Approximately five months after they secured the permit, Alicia moved to Billy's

10   former room downstairs, where she stayed until she was seventeen.  RT 95, 100, 560.  The family

11   did most of the work themselves throughout 1998 and 1999.  RT 126, 561.

12           After Alicia moved downstairs, petitioner would come to her room approximately

13   once a week, generally late at night.  RT 105, 108, 152.  He would close and lock the door, pull

14   her legs to the side of the bed and remove her pajama bottoms, overcoming her resistance to

15   being undressed.  RT 106.  Petitioner would stick his fingers and then his penis into her vagina

16   and perhaps seventy-five percent of the time he would touch and kiss her breasts.  RT 106, 109.

17   Petitioner would not wear a condom, but would pull out and ejaculate on her stomach, in his

18   hand, or into a tissue.  RT 107-108.  Alicia would cry.  RT 107.  If petitioner heard someone, he

19   would go into the bathroom.  RT 110.

20           Once, when Alicia was in the downstairs bedroom and petitioner was having sex

21   with her, Kumcha came to the door and tried to open it.  RT 112.  She knocked and said "what

22   are you doing in there?"  RT 112, 574.  Petitioner pulled up his pants and opened the door.

23   RT 112.  Alicia went under the covers.  Id.  Petitioner said that Alicia was having a bad dream

24   and that the door must have locked accidentally.  RT 113, 574.  Kumcha came into the room and

25   asked Alicia if she was all right.  RT 113, 574.  Kumcha trusted petitioner and so did not think

26   anything inappropriate had happened.  RT 664.

4

1    Kumcha and the girls were Jehovah's Witnesses and attended meeting three times
2  a week.  RT 593.  Sometimes Alicia stayed home from meeting ostensibly because she had a lot
3  of homework or had to help around the house.  RT 420, 654.  One evening in 1997 or 1998,
4  Gina, Elizabeth and Kumcha returned home from a church meeting and found the front door
5  locked.  RT 419, 425.  The family generally did not lock the door when anyone was home and
6  because petitioner and Alicia had remained at home, no one had a key.  RT 419.  Petitioner
7  appeared flustered when he answered the door and said he had decided that they should lock the
8  doors from then on.  RT 428.  Alicia was on the couch, crying.  RT 419, 425.

9    Petitioner bought a car for Alicia when she turned sixteen.  RT 577.  He worked
10  on the car and enlisted Alicia's help.  RT 135, 578.  Sometimes when they were working on the
11  car, he took her into one of the sheds on the property, pulled her pants down, told her to bend
12  over and then put his penis in her vagina.  RT 134.  This occurred ten or fifteen times before she
13  turned eighteen and ten or fifteen times after she turned eighteen.  RT 135-136.  He ejaculated
14  into a towel and threw the towels into a bucket.  RT 138.  After the mudroom was added,
15  petitioner would ask Alicia to get a tool and then come into the mudroom after her.  She would
16  resist as he unfastened her pants, but he would always pull harder and then bend her over for an
17  act of intercourse.  RT 129, 258.  He would ejaculate into his hand or into a paper towel or tissue
18  and dispose of the towel into a basket.  RT 129.  There were ten instances of intercourse in the
19  mudroom and during half those times, petitioner also put his fingers in her vagina.  RT 129.

20    Work on the upstairs was completed in late spring 2001, and Alicia moved back
21  upstairs.  RT 564-565.  She was seventeen and a senior in high school.  RT 122.  Petitioner
22  continued to put his fingers and penis in her vagina and sometimes his mouth on her vagina in
23  her room upstairs, but generally when no one else was home.  RT 122-123.  Intercourse occurred
24  less frequently when she moved back upstairs, but more frequently petitioner would grab Alicia's
25  hand and put it on his penis.  RT 110-111.

26  ////

1    Petitioner's sexual acts with Alicia continued after she turned eighteen and had

2  started college.  RT 125.  Alicia did not have class on Wednesdays and on some of those days,

3  petitioner would come home during his lunch hour, grab Alicia by the arm and pull her into her

4  sister Elizabeth's room for sex.  RT 141.

5    Alicia was adamant that she never had consensual sex with petitioner, even when

6  she was eighteen or nineteen; that she never kissed him in a sexual way on her own; that she did

7  not initiate sex with petitioner; and never took her pants down on her own.  RT 203, 281, 312.

8  The parties stipulated, however, that during an interview with the deputy district attorney, Alicia

9  said that although petitioner would usually pull her pants down, sometimes he would ask her to

10  do so and she would comply.  CT 452; RT 1013.

11    One of the last times petitioner tried to have sex with Alicia was in December

12  2002 or January 2003.  RT 141-142.  Petitioner came home at lunch and pulled Alicia into

13  Elizabeth's room.  RT 143.  Alicia cried and told him she couldn't do it any more.  RT 143-144.

14  He had sex with her anyway.  RT 144.  After that, on another occasion, petitioner grabbed her as

15  she walked by and when she resisted, he said "what do you think I'm going to do, rape you?"

16  RT 145.  She pushed him away.  RT 145.

17    After Alicia graduated from high school, she began asking to move out of the

18  house.  RT 578.  She was in college, though, and had no money to move out.  RT 142-143.  She

19  was fighting all the time with petitioner.  RT 204.  Kumcha thought Alicia wanted to move out

20  so she could have the freedom to date and to be more involved in their religious activities, which

21  petitioner would not allow because of all the things petitioner wanted help with around the house.

22  RT 585.  Eventually, Alicia's grandfather said she could move into the apartment over his

23  garage, rent-free.  RT 143, 207.

24    One night in March 2003, when Kumcha was showering, petitioner grabbed

25  Alicia and when she resisted, petitioner called her a "cold-hearted, selfish fucking bitch."

26  RT 146.  Kumcha heard Alicia crying, so went to Alicia's room.  RT 579.  Alicia said petitioner

1  had called her a cold bitch.  RT 579.  Kumcha asked petitioner why, but he denied saying

2  anything.  He went to Alicia's room and apologized.  RT 579.

3         Despite petitioner's ongoing activities with Alicia, when Elizabeth turned thirteen,

4  petitioner began to touch her sexually.  RT 324.[3]  The first time he put his hand down her pants.

5  RT 324.  After that, he began coming into her room around 6:00 a.m., where she would be

6  sleeping on her stomach.  RT 328, 329.  He would lift her tee shirt, rub her back and then slide

7  his hand under her pajama bottoms and squeeze or kiss her bare buttocks.  RT 329, 331, 338.  On

8  occasion, he would attempt to reach around to her vaginal area, but she would pull his hand

9  away.  When she did so, he would say "don't be mean to me."  RT 333.  Petitioner touched her in

10 a similar way hundreds of time, up until she was seventeen.  RT 334-335.  Elizabeth was scared

11 of petitioner, but he did not threaten her or warn her against telling anyone.  RT 361.

12        Once, Gina came into Elizabeth's room when petitioner had his hand on her chest;

13 her tee shirt was pulled up.  RT 365, 413.  Petitioner said he was checking Elizabeth's heart beat.

14 RT 365, 415.

15        On March 17, 2003, when Kumcha and petitioner were driving home from work,

16 petitioner said he seemed to be chasing the girls away.  RT 580-581.  Kumcha said they were old

17 enough to move out, so he should not worry about it.  RT 581.  Petitioner said they should call

18 the girls and meet them at a Chinese restaurant.  At the restaurant, Alicia said she was moving to

19 her grandfather's house.  RT 581.  Petitioner became furious and left without eating.  RT 581.

20        When they got home, petitioner asked Alicia why she was moving to her

21 grandfather's house when her grandfather did not love her and petitioner did.  RT 582.  Alicia

22 began to cry.  RT 582.  Kumcha then said she would take Wednesday off work so they could

23 talk.  RT 583.  Kumcha told petitioner about the plan; he asked if Alicia had told her anything.

24 RT 583.

25
26        [3] She acknowledged that she told police the touching began when she was fourteen, but
after reflection, she realized it began when she was thirteen.  RT 351-352, 384.

On March 18, 2003, petitioner asked Kumcha to leave work a few hours early so he could tell her something. Once they got home, he told Kumcha he had had sexual relations with Alicia. RT 587. Kumcha asked why he ruined Alicia's life, but did not ask him how long he had been having sexual relations with Alicia. RT 588, 657.

Alicia explained that she did not tell anyone about the molestation because petitioner told her it would not turn out the way she wanted, which she understood to mean that no one would believe her. RT 113. He also said it would break her mother's heart. RT 113. In addition, she began to be worried about her sister Elizabeth, because it appeared to Alicia that petitioner was sitting too close to Elizabeth and looking at her in the same way he looked at Alicia. RT 159. Alicia thought that if petitioner continued to have intercourse with her, nothing would happen to Elizabeth. RT 158. Elizabeth did not say anything about the touching because she did not know how to tell people about it. RT 345.

On March 19, 2003, Deputy Dan Griffith of the Sacramento County Sheriff's Department was dispatched to petitioner's house in Wilton and took a statement from Alicia. RT 669. Alicia took him to the mudroom, where she pointed out a bucket that held some paper towels or napkins crumpled in the bottom. RT 671, 674-675. He could see some yellowish discoloration of the towels, which were touching each other. RT 676, 693. Griffith accompanied Alicia to a shed, where he found more crumpled up paper towels in a basket on a shelf. RT 678. These, too, had yellowish discoloration and were touching each other. RT 680, 693, 699. He collected and bagged the evidence. RT 681, 683, 695.

Dean Bowen is a detective with the Sacramento County Sheriff's child abuse unit. RT 484. On March 19, 2003, he had Alicia make a pretext call to petitioner . RT 487. He listened to the call and wrote questions for Alicia to ask petitioner. RT 153, 489. During the call, Alicia said "this has been going on . . . for six years," and petitioner said "yeah." She also said she had told Kumcha how long it had been going on and petitioner said "well, I'm not gonna put any of it on you. . . ." CT 727. Alicia asked petitioner about the first time they had sex and

petitioner said it was "in the upstairs, before we did the remodel."  CT 729.  When she asked why petitioner chose her "to do this to," he responded that he loved her.  CT 730.  Alicia asked "how we did it for that long without . . . me getting pregnant," and petitioner said he never ejaculated inside her.  CT 734.   When petitioner said he would never do anything to hurt her, she asked "so all these years . . . this wasn't hurting me?"  RT 735.  And when petitioner said he thought she enjoyed it, Alicia asked how she could have enjoyed it when she was thirteen years old.  CT 736.  Petitioner reiterated that he thought she enjoyed it.  CT 736.

There was a second call later that evening.  RT 500.  Petitioner told Alicia he was "not saying a thing about our relationship" and would not "lay any blame on you . . . ."  Alicia asked "how is it like a relationship?"  RT 750.  Petitioner said he wanted her for himself.  RT 751.

A few days later, petitioner arrived unannounced at the house and asked to talk to Kumcha.  RT 589.  Petitioner said if she was going to call the police, he would sign everything.  RT 590.

Criminalist Jeff Herbert performed DNA testing on the semen found on four of the paper towels recovered from the shed and the mudroom, developed profiles from the samples and compared them to the reference samples taken from Alicia and petitioner.  RT 739, 741.  The profile from the sperm fraction of all four towels matched petitioner.  RT 742-743.  When he was not able to separate the sperm fraction completely from the female contribution to the sample, he determined that petitioner was the major contributor of the sample and Alicia the minor contributor.  RT 746.

Herbert acknowledged that there was a third peak at one of the alleles which did not match petitioner or Alicia, but attributed that to a "stutter" or an artifact from the process of duplicating the DNA for testing.  RT 765, 768, 782.  He determined that this was a stutter and not a true DNA peak because nothing else suggested a third person had been present.  RT 774.

////

1    Dr. Anthony Urquiza is a psychologist and the director of the CAARE Center,

2  part of Department of Pediatrics at UCD Medical Center, which provides services to families

3  with abuse or violence issues.  RT 512-513.  He also does research into the area of child abuse as

4  well as clinical work in the field.  RT 513, 516.  He described the Child Sexual Abuse

5  Accommodation Syndrome, an educational tool applicable to children between the ages of four

6  and eighteen.  RT 525-527.  Dr. Urquiza testified that it is typical for the child to delay disclosure

7  of the abuse.  RT 533.  He also explained that children sometimes endure the abuse in order to

8  protect a younger child.  RT 532.

9    The defense called a number of witnesses.  Billy Neely testified that there was a

10  key hidden outside and everybody knew about it.  RT 853.  Billy's wife Jenny testified that

11  Kumcha's girls never seemed afraid of petitioner and that they were eager to help Jenny select

12  Christmas presents for petitioner.  RT 862, 865.  Sean Gehrke lived in a mobile home on

13  petitioner's property with his grandparents and said one of the sheds belonged to his grandfather,

14  Jim McCurry, who had the only keys to it.  RT 882, 884.  Gehrke also said the mudroom was

15  only ten to fifteen feet from the trailer and one could see inside the mudroom from the trailer.

16  RT 891.  Kathy Roberts, petitioner's ex-wife, said that her stepfather Jim McCurry did not want

17  people to get into his things stored in the shed; she acknowledged, however, that she gave

18  petitioner the keys to the shed in October 2001.  RT 901, 907.  Wendi Cross, petitioner's

19  daughter, said that the girls treated petitioner as a father figure and never seemed afraid of him.

20  RT 840.

21  II.  Procedural Background

22    A complaint was filed on June 23, 2003, charging thirty-six different counts based

23  on acts against Alicia and Elizabeth.  Lodg. Doc. 13 at 13-32, CT 13-23.  Although there are

24  records which indicate that an arrest warrant was requested, Lodg. Doc. 13 at 33-34, there is no

25  copy of the warrant itself.  On July 16, 2003, the petitioner was arraigned on the charges.  Lodg.

26  Doc. 13 at 1.  In November, 2004, a jury trial commenced.  Lodg. Doc 13 at 7.  The jury was

1   instructed that count two was a lesser included offense of count one and that count four was a

2   lesser included offense of count three and that if they returned guilty verdicts on the greater

3   counts, they need not address the lesser counts.  RT 1257-1261.  Because the jury returned guilty

4   verdicts on counts one and three, as well as all the other remaining counts, there are no verdicts

5   on counts two and four.  RT 1294.

6          On direct appeal from his conviction, petitioner's appointed appellate counsel

7   challenged only the determination of the custody credit and the wording of the abstract of

8   judgment.  Lodg. Doc. 2.  Acting in pro per, petitioner then filed a petition for review in the

9   California Supreme Court, raising a number of grounds not presented to the Court of Appeal.

10  Lodg. Doc. 3.  That court denied review.  Lodg. Doc. 4.

11         Petitioner thereafter filed a petition for collateral review in the Sacramento County

12  Superior Court.  Lodg. Docs. 5 & 6.  That court found that petitioner's misdemeanor convictions,

13  counts thirty-five and thirty-six, were barred by the statute of limitations, but denied the petition

14  in all other respects.  Lodg. Docs. 7 & 8.

15         Petitioner thereafter sought habeas relief from the California Court of Appeal and

16  Supreme Court, both of which denied his petitions without comment.  Lodg. Docs. 9-12; see also

17  Am. Pet. at unnumbered page 9.

18  III.  Standards Under The AEDPA

19         An application for a writ of habeas corpus by a person in custody under a

20  judgment of a state court can be granted only for violations of the Constitution or laws of the

21  United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

22  claim decided on the merits in state court proceedings unless the state court's adjudication of the

23  claim:

24         (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established federal law, as
25         determined by the Supreme Court of the United States; or

26         (2) resulted in a decision that was based on an unreasonable

11

1    determination of the facts in light of the evidence presented in the
     State court proceeding.

2

3    28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[4]  It is the habeas

4    petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

5    Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

6           The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

7    different.  As the Supreme Court has explained:

8            A federal habeas court may issue the writ under the "contrary to"
             clause if the state court applies a rule different from the governing
9            law set forth in our cases, or if it decides a case differently than we
             have done on a set of materially indistinguishable facts.  The court
10           may grant relief under the "unreasonable application" clause if the
             state court correctly identifies the governing legal principle from
11           our decisions but unreasonably applies it to the facts of the
             particular case.  The focus of the latter inquiry is on whether the
12           state court's application of clearly established federal law is
             objectively unreasonable, and we stressed in Williams [v. Taylor,
13           529 U.S. 362 (2000)] that an unreasonable application is different
             from an incorrect one.

14

15   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

16   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

17   fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

18   (2002).

19          The court will look to the last reasoned state court decision in determining

20   whether the law applied to a particular claim by the state courts was contrary to the law set forth

21   in the cases of the United States Supreme Court or whether an unreasonable application of such

22   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

23   919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

24   of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

25

26         [4]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not
     grounds for entitlement to habeas relief.  Fry v. Pliler, 127 S. Ct. 2321, 2326-27 (2007).

1  must perform an independent review of the record to ascertain whether the state court decision

2  was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other

3  words, the court assumes the state court applied the correct law, and analyzes whether the

4  decision of the state court was based on an objectively unreasonable application of that law.

5         It is appropriate to look to lower federal court decisions to determine what law has

6  been "clearly established" by the Supreme Court and the reasonableness of a particular

7  application of that law.  "Clearly established" federal law is that determined by the Supreme

8  Court.  Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is

9  appropriate to look to lower federal court decisions as persuasive authority in determining what

10  law has been "clearly established" and the reasonableness of a particular application of that law.

11  Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th

12  Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo,

13  365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of

14  Supreme Court precedent is misplaced).

15  IV.  The Statute Of Limitations And Ex Post Facto (Claims I, V, VII, XI)

16         Petitioner has raised four claims centering on the statute of limitations.  In the first

17  claim in the petition, he argues that the statute of limitations on some of the charges had expired

18  and was revived through the mechanism of California Penal Code § 803(h), the application of

19  which violates the Ex Post Facto clause of the United States Constitution.  In the petition's fifth

20  ground, petitioner argues that certain counts were barred by the "normal" statute of limitations

21  and not subject to section 803(h).  In claim seven, he contends the prosecutor misstated the law

22  about the statute of limitations during argument.  In claim eleven, petitioner contends that for

23  several of the counts with determinate terms, the statutory maximum for purposes of calculating

24  the statute of limitations must be the middle term, which places those counts outside the statute

25  of limitations.

26  \\\\

Generally, "a state court's failure properly to apply a state statute of limitations does not violate due process or, indeed, any other provision of the Constitution or a federal statute." Loeblein v. Dormire, 229 F.3d 724, 726 (8th Cir. 2000). A claim based on a statute of limitations may raise ex post facto concerns, however, when time-barred prosecutions are revived by statute because "after . . . the original statute of limitations had expired, a party . . . was not 'liable to any punishment'" and because the resurrection of a prosecution after the statute of limitations has expired violates the Ex Post Facto Clause of the United States Constitution, because a revival "eliminate[s] a currently existing conclusive presumption forbidding prosecution and . . . permit[s] conviction on a quantum of evidence where that quantum, at the time the new law is enacted, would have been legally insufficient." Stogner v. California, 539 U.S. 607, 613, 615 (2003). However, the Supreme Court also said:

> Even where courts have upheld extensions of *unexpired* statutes of limitations (extensions that our holding today does not affect . . .), they have consistently distinguished situations where limitations periods have *expired*. Further they have often done so by saying that extension of existing limitations periods is not *ex post facto* "provided", "so long as," "because," or "if" the prior limitations periods have not expired– a manner of speaking that suggests a presumption that revival of time-barred criminal cases is *not* allowed.

Stogner, 539 U.S. at 618 (emphasis in original).

Relying on Stogner, petitioner argues that the penal code sections applied in this case revived rather than extended the statutes of limitations. The Superior Court rejected this claim:

> Although the trial court erred on which statute of limitations period applied for certain crimes, at all times there was a proper statute of limitations that had not run, for each felony, as discussed below.
>
> In Case No. 03F05570, an arrest warrant was issued on June 26, 2003, commencing the case for statute of limitations purposes. (Penal Code § 804(d)).
>
> Counts 1, 3, and 5 through 7 charged Penal Code § 269(a)(1), based on forcible rape, Penal Code § 269(a)(5), based on forcible digital penetration, Penal Code § 288(a), and Penal Code §

14

289(a)(1) offenses occurring between October 31, 1996 and October 30, 1997.  Between those dates, Penal Code § 269(a)(1) and (5) provided for a maximum punishment of 15 years to life, Penal Code § 288 (a) provided for a maximum punishment of 8 years.

This meant that for the Penal Code § 269(a)(1) and (5) charges, there was no statute of limitations that applied, as the offenses were punishable by life in prison (Penal Code § 799 (1994 Stats., ch. 409 § 1). There was no statute of limitations problem with these charges.

As for the Penal Code § 288(a) and 289(a)(1) offenses, the Penal Code § 803 (h) allegations were unnecessary, as the normal statute of limitations had not yet run.  Specifically, both Penal Code §§ 288 and 289 were listed in Penal Code § 290(a)(2)(A), from October 31, 1996, through 2003.  Between October 31, 1996 and June 26, 2003, Penal Code § 800 provided as it does now that when an offense is punishable by eight years in state prison, the statute of limitations is six years after the commission of the offense.  The maximum punishment for the offense is applicable in this context...  Thus between 1996 and 2003, the normal statute of limitations for a Penal Code § 288 or 289 offense was six years. This meant that the Penal Code § 800 statute of limitations period did not expire until beginning October 31, 2002.  Effective January 1, 2001, former Penal Code § 803(h) was amended to provide that for a felony listed in Penal Code § 290(a)(2)(A), for which the statute of limitations period in Penal Code § 800 had expired as [of] January 1, 2001, the statute of limitations was extended to instead be for 10 years from the commission of the offense.  On January 1, 2002, former Penal Code § 803(h) was renumbered as former Penal Code § 803(i) without substantive change, thereby continuing the 10-year statute of limitations for any felony offense listed in Penal Code § 290(a)(2)(A).  Thereafter, Penal Code § 803 was amended without change to its subdivision (i) in 2002 Stats., ch. 1059 § 2, and 2003 Stats., Ch. 2 § 1.  Thus, when the prosecution was commenced on June 26, 2003, the applicable statute of limitations period had become 10 years for these offense, which had not yet run.

It is not unconstitutional to apply the statute of limitations as described above.  When a statute of limitations such as Penal Code § 800, has not yet expired, the Legislature may pass a new statute of limitations to extend the existing statute of limitations. . . . .

Also in Case No. 03F05570, Counts 8 through 15 charged Penal Code § 288(c)(1) offenses occurring between October 31, 1997 and October 30, 1998.  The maximum punishment for those offenses at that time was 3 years.  Thus the normal statute of limitations for the offenses was 3 years, which had run by October 31, 2000-October 30, 2001.  It was not extended by former Penal Code §

15

803(h) effective January 1, 2001, because the applicable statute of limitations was Penal Code § 801 and not Penal Code § 800. However, at the time of the commission of the offenses, former Penal Code § 803(g) did provide for a statute of limitations of one year after the victim's report is made to law enforcement, if the Penal Code § 800 statute of limitations had run. Successor provisions to former Pena Code § 803(g) kept the provision in place, at the time of the commencement of the prosecution, as former Penal Code § 803(h). Thus, there was no problem with the statute of limitations to these offenses.

For the same reasons as discussed above for Counts 8 through 15, there was no problem with the statute of limitations applied to counts 16 through 23, which charged Penal Cod § 288 (c)(1) offenses occurring between October 31, 1998 and October 30, 1999.

Counts 24 and 25 charged Penal Code § 288a(b)(1) and 289 (h) offenses occurring between October 31, 1999 and June 30, 2000. For the reasons discussed above, pertinent to Counts 1, 3, and 5 through 7, the statute of limitations was actually a 10 year statute of limitations period, which had not run out at the time the prosecution was commenced.

Counts 26 through 29 charged Penal Code § 288a (b)(1), and 289(h) offenses occurring between July 1, 2000 and October 30, 2001. Their normal statute of limitations periods had not run at the time the prosecution was commenced. The same is true of Count 30, which charged a Penal Code § 288 (c)(1) offense occurring between July 1, 2000 and August 22, 2000 and Counts 31 through 34, which charged Penal Code § 288 (c)(1) offenses occurring between August 23, 2000 and August 22, 2001.

Lodg. Doc. No. 7 at 5-10.

The starting point for these claims is the charging document filed in this case. The complaint was filed on June 26, 2003 and was deemed to be an information on November 12, 2003. The charges and penalties pertinent to the claims of error are these:

- counts one and three charged violations of section 269(a)(5), committed between October 31, 1996 and October 30, 1997, punishable by a term of fifteen years to life;

- counts five through seven charged violations of section 288(a), committed between October 31, 1997 and October 30, 1998, punishable by a term of

three, six or eight years;

- counts eight through fifteen charged violations of section 288(c)(1), committed between October 31, 1997 and October 30, 1998, punishable by a term of one, two or three years;

- counts sixteen through twenty-three charged violations of section 288(c)(1), committed between October 31, 1998 and October 30, 1999, punishable by a term of one, two or three years;

- count twenty-four charged a violation of section 289(h), committed between October 31, 1999 and June 30, 2000, punishable by a term of sixteen months, two or three years;

- count twenty-five charged a violation of section 288a(b)(1), committed between October 31, 1999 and June 30, 2000, punishable by a term of sixteen months, two or three years;

- counts twenty-six and twenty-seven charged violations of section 261.5(c), committed between July 1, 2001 and October 30, 2001, punishable by a term of sixteen months, two or three years;

- count twenty-eight charged a violation of 289(h), committed between July 1, 2001 and October 30, 2001, punishable by a term of sixteen months, two or three years;

- count twenty-nine charged a violation of section 288a(b)(1), committed between July 1, 2001 and October 30, 2001, punishable by a term of sixteen months, two or three years;

- counts thirty through thirty-four charged violations of section 288(c)(1), committed between July 1, 2001 and August 22, 2001, punishable by a term of one, two or three years.

The information also alleged that counts one through twenty-five were filed under the authority of section 803(h).  CT 13-23.

A.  <u>Counts One And Three</u>

Petitioner makes the puzzling argument that prosecution on counts one and three was barred because section 269 is not one of the statutes listed in section 803(h), which the prosecution alleged in the information.  He also argues that the statute of limitations is not governed by section 799.  Petition,[5] Points and Authorities at 35.  Whatever errors the prosecution made in listing the statute of limitations tolling or extending provisions, it had no impact on these counts and thus raises no federal constitutional.  The penalty for a violation of section 269(a)(5) is a term of fifteen years to life and under section 799, there is no statute of limitations for offenses punishable by life.  It does not matter what the prosecutor alleged: the statute of limitations is not an element of the offense and the requirement that the applicable provisions be pleaded and proven is a matter of state law.  <u>People v. Thomas</u>, 146 Cal.App.4th 1278, 1285-86 (2007).

B.  <u>Counts Five Through Twenty-Five</u>

In their most basic incarnation, the length of the statute of limitations in California depend on the length of the maximum sentence for the offense.  <u>See</u> §§ 800, 801.  However, as the Superior Court noted, the California Legislature has enacted a series of changes to the limitations periods for child molestation cases.  <u>See generally</u> <u>In re White</u>, 163 Cal.App.4th 1576 (2008).  As the <u>White</u> court noted, effective January 1, 2001, former section 803(h)(1) was added, extending the statute of limitations for offenses listed in the former section 290(a)(2)(A) from six years to ten years if the statute had not expired at the time of the enactment.  <u>Id</u>. at 1580. In 2001, the offenses listed in former section 290(a)(2)(A) included section 288, which was charged in counts five through seven.  At the time of their commission, the statute of limitations for those offenses was six years and so had not expired at the time former section 803(h)(1) was enacted, extending the statute of limitations to ten years.  This section was redesignated as

---

[5]  The court refers to the amended petition filed January 21, 2009.

1   section 803(i) at the time of the instant prosecution, a change which did not effect any repeal of

2   its substantive provisions.  Id. at 1580.

3            Counts eight through twenty-five charged violations occurring between October

4   31, 1996 and October 1997; October 31, 1997 and October 30, 1998; October 1998 through

5   October 31, 1999 and October 31, 1999 through June 30, 2000, each with maximum terms of

6   three years.  Under section 801, the three year statute of limitations would expire between 1999

7   and 2003.  However, in 1994 the Legislature adopted former section 803(g), which provided in

8   pertinent part that "a criminal complaint may be filed within one year of the date of a report to a

9   law enforcement agency by a person of any age alleging that he or she, while under the age of 18

10  years, was the victim of a crime described in Sections 261, 286, 288, 288a, 288.5, 289 or 289.5."

11  People v. Robertson, 113 Cal.App.4th 389, 392 (2003).  As the California Court of Appeal

12  explained, the statute went through several revisions and that portion which permitted the revival

13  of an expired statute of limitations was invalidated by Stogner.  The court nevertheless found that

14  its provisions permitted the prosecution of otherwise barred offenses as long as the prosecution

15  began a year after the victim's report to law enforcement.  Under section 803(g), which was in

16  force at the time these offenses were committed, the victims' report to law enforcement in March

17  2003 triggered the year, and as the complaint was filed in June 2003, it was well within the

18  statute of limitations.  See People v. Superior Court, 116 Cal.App.4th 1192, 1197 (2004); In re

19  Yovanov, 69 Cal.App.4th 392, 402 (1999) (filing of the complaint is relevant event for

20  prosecutions under 803(g)).

21        C.  Counts Twenty-Six Through Thirty-Four

22            Once again, petitioner argues that the statute of limitations for these offenses was

23  two years, not three; that it had run before the filing of the information in this case; and that it

24  was not extended by section 803(h).  He is wrong as a matter of state law: for crimes punishable

25  by imprisonment in state prison, as are these offenses, the statute of limitations is, and was at the

26  time the offenses were committed, three years.  Section 801.  Because these offenses occurred in

19

1   2001, the prosecution was timely when the information was filed in November 2003.[6]

2         D.   Blakely And The Maximum Term; Instructions On The Statute Of Limitations

3                   In California, the appropriate statute of limitations is determined by the maximum

4   term of imprisonment for the offense.  Sections 800 & 801.  The maximum term for statute of

5   limitations period is "the maximum punishment prescribed by statute for the offense, regardless

6   of the punishment actually sought or imposed."  Section 805(a); People v. Simpson, 186

7   Cal.App.3d 1125, 1130 (1987).  Petitioner argues that the "maximum" term should be the middle

8   of the range of determinate terms, under the reasoning of Apprendi v. New Jersey, 510 U.S. 466

9   (2000), Blakely v. Washington, 542 U.S. 296 (2004) and Cunningham v. California, 549 US. 270

10  (2007).  In those cases, the Supreme Court held that a defendant's maximum sentence could not

11  be increased by facts neither found by a jury nor admitted by the defendant and determined that

12  for Sixth and Fourteenth Amendment purposes, the middle term of any of California's DSL term

13  was the maximum which could be imposed absent found or admitted aggravating factors.  These

14  decisions were based on a defendant's Sixth and Fourteenth Amendment right to a jury trial; they

15  did not address the use of the phrase "maximum term" in any other aspect of the criminal law.

16                  In Renderos v. Ryan, 469 F.3d 788 (9th Cir. 2006), the Ninth Circuit considered

17  whether Apprendi required a jury to find the triggering conditions for the application of § 803(g)

18  beyond a reasonable doubt.  The court noted that no federal case law had held that the timeliness

19  of a prosecution must be proven beyond a reasonable doubt and observed that Section 803(g)

20  neither defines a crime nor prescribes facts that constitute a crime.  Id. at 797.  Similarly, the use

21  of the highest of the three permissible DSL terms as a means of measuring the appropriate statute

22  of limitations says nothing about the ultimate sentence which may be imposed, which is the

23

24       [6] Petitioner is correct that the state court record does not reflect that an arrest warrant was issued and that the state court finding on that point is not a reasonable determination of fact, but

25  it does not matter.  Generally, a prosecution is commenced for statutes of limitations periods by the filing of an information or the issuance of an arrest warrant.  Section 804.  In this case, as

26  noted above, even if this court considers the prosecution commenced in November 2003 when the information was filed, there is no timeliness problem and no ex post facto problem.

1    central concern of <u>Apprendi</u>, <u>Blakely</u>, and <u>Cunningham</u>.  Petitioner's argument thus fails.

2              In his traverse, to the extent the court understands the contentions, petitioner

3    argues that the jury instructions on the statute of limitations were incorrect and that the jury's

4    determination based on an instruction which identified the statute of limitations for most of the

5    counts as three years somehow binds any court to a three year statute even for those counts which

6    were subject to six or ten year statutes.  Traverse, P.&A. at 6-7.  As the superior court judge who

7    decided the habeas noted, "the trial court erred on which statute of limitations period applied for

8    certain crimes."  Lodg. Doc. 7 at 5-6.  However, as this court has found no improper revival of

9    the statute of limitations and thus no ex post facto problem, any errors in the jury instructions

10   concerning the statute of limitations raise only state law claims not cognizable on federal habeas

11   corpus.  <u>Loeblein v. Dormire</u>, 229 F.3d 724, 726 (8th Cir. 2000).

12         E.  <u>The Prosecutor's Argument</u>

13             Petitioner claims that the prosecutor deliberately misled the jury by arguing that

14   prosecution on counts one and three was not time-barred.  Am. Pet., P.&A. at 55.  For the

15   reasons explained above, even if the prosecutor was incorrect, it was immaterial. There was no

16   error.

17   V.  <u>Ineffective Assistance of Trial Counsel</u> (Claim II)

18             Petitioner contends that trial counsel was ineffective in the following ways: (1)

19   counsel failed to hire or consult an expert who could have testified that petitioner did not have

20   "the character traits necessary to commit the offenses;" (2) failed to cross examine the

21   prosecution's CSAAS expert effectively by showing, for example, that an article relied upon by

22   Dr. Urquiza did not exist or to challenge it in any way or by hiring an expert to show that

23   CSAAS is no longer accepted in the field of child abuse research; (3) failed to raise a challenge

24   to counts eight through thirty-six based on the statute of limitations; (4) failed to inform

25   petitioner that he was facing a sentence of fifty-eight years to life and failed to negotiate "a

26   reasonable plea bargain" and (5) failed to hire a DNA expert.

> The federal law on claims of attorney ineffectiveness is clear: First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

Strickland v. Washington, 466 U.S. 668, 687 (1984). "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. This court must presume "that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Id. at 689.

It also is petitioner's burden to establish prejudice: "A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

Petitioner raised only one segment of this claim in the superior court, which rejected his claims that counsel failed to call an expert witness, failed to cross-examine the CSAAS expert properly and failed to raise the statute of limitations on the ground that petitioner had not provided the transcripts necessary for evaluation of the questions. Lodg. Doc. No. 7 at 5; Lodg. Doc. No. 5.[7] He raised these grounds plus his additional challenge to counsel's failure to

---

[7] Respondent does not argue that this constitutes a procedural bar to this court's consideration of the issue. This court finds any claim of procedural default waived and declines to raise it on its own. Cone v. Bell, — U.S —, 129 S.Ct. 1769, 1791 n.6 (2009), and a court is not required to raise it sua sponte. Trest v. Cain, 522 U.S. 87, 89 (1997).

1   retain a DNA expert and failure to negotiate a reasonable plea in the petition to the California

2   Supreme Court, which denied the petition without comment.  Lodg. Doc. Nos. 11 & 12.

3        A.   <u>Failure To Present A Stoll Expert</u>

4           In <u>People v. Stoll</u>, 49 Cal. 3d 1136 (1989), the California Supreme Court held that

5   a court may not exclude evidence of psychological testing that shows a defendant charged with

6   child molestation does not fit the profile of a child molester.  <u>Id</u>.  Petitioner claims that counsel

7   was ineffective in failing to present a <u>Stoll</u> expert as part of the defense.

8           The Ninth Circuit considered the same claim in <u>Brodit v. Cambra</u>, 350 F.3d 985

9   (9th Cir. 2003).  In that case, the petitioner supported his petition with an evaluation done after

10   trial, which concluded that he did not have the "'usual characteristics of a resident child

11   molester.'"  <u>Id</u>. at 992.  At an evidentiary hearing, counsel testified he did not present such

12   evidence in order to avoid opening the door to the prosecution's presentation of damaging

13   evidence.

14           In this case, however, petitioner has presented neither an evaluation suggesting

15   that he was not predisposed to molest children nor any information suggesting that trial counsel

16   was unaware of the <u>Stoll</u> decision or rejected hiring a <u>Stoll</u> expert outright.  As the Supreme

17   Court has said:

> 18   When counsel focuses on some issues to the exclusion of others,
> there is a strong presumption that he did so for tactical reasons
> 19   rather than through sheer neglect.  That presumption has particular
> force where a petitioner bases his ineffective-assistance claim
> 20   solely on the trial record, creating a situation in which a court may
> have no way of knowing whether a seemingly unusual or misguided action
> 21   by counsel had a sound strategic motive.

22   <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) (internal citation & quotation omitted).

23           This case is more like <u>Yarborough</u> than <u>Brodit</u>:  petitioner asks this court to ignore

24   the presumption that trial counsel's decision was tactical without any supporting evidence.

25   Moreover, this case is unlike <u>Brodit</u> because petitioner has not presented a psychologist's report

26   concluding that he does not fit the profile of a child molester.  See <u>Grigsby v. Blodgett</u>, 130 F.3d

1   365, 272 (9th Cir. 1997) (speculative claim of prejudice, unsupported by evidence, insufficient).

2   Petitioner has not borne his burden of showing either deficient performance or prejudice.

3   Shumate v. Newland, 75 F.Supp.2d 1076, 1092-93 (N.D. Cal. 1999) (failure to call Stoll expert

4   not deficient performance).

5        B.   Failure To Rebut Dr. Urquiza

6            Petitioner argues that counsel was ineffective in failing to cross-examine the

7   prosecution's expert about a study upon which he relied concerning delayed disclosure of

8   molestation (RT 533) and in failing to consult an expert to show there are no "exact" symptoms

9   of child abuse.  Am. Pet., P.&A. at 11.

10           Trial counsel's strategic decisions at trial concerning the proper scope of cross-

11  examination are entitled to great deference.  Brown v. Uttecht, 530 F.3d 1031 (9th Cir. 2008),

12  cert. denied sub nom. Brown v. Sinclair, ___ U.S. ___, 129 S.Ct. 1005 (2009); Dows v. Wood,

13  211 F.3d 480, 487 (9th Cir. 2000).  Trial counsel's cross-examination of the prosecution's expert

14  was admittedly brief: he asked a question about academic performance as a predictor of abuse

15  and about the witness's role in providing "an educational tool."  RT 540-541.  The court need not

16  decide whether this is deficient performance, however, because petitioner has not shown

17  prejudice.

18           Petitioner suggests that there was no study about delayed disclosure of

19  molestation and that had counsel demonstrated this fact, it would have bolstered the defense.  He

20  relies on Linstadt v. Keane, 239 F.3d 191, 201 (2d Cir. 2001), in which the court found that trial

21  counsel's failure to obtain a copy of a "Boston study" which was the sole basis on which the

22  prosecution's expert determined that ambiguous physical findings were an indication of child

23  abuse.  In this case, however, Dr. Urquiza's testimony did not depend solely on the study,

24  petitioner has provided nothing suggesting that the study did not exist or even suggest what

25  information could have been developed in a more complete cross-examination of the

26  prosecution's expert.  He also suggests that had trial counsel done appropriate research and

1  consulted an expert, he would have discovered that CSAAS is no longer accepted in the scientific

2  community.  Amended Petition, Points and Authorities at 17.  In support, however, he does not

3  cite any scientific literature, but instead relies on an affidavit submitted as part of a petition in

4  Gerstein v. Senkowski, 299 F.Supp.2d 84, 95 (E.D.N.Y. 2004).  That case does not help him, for

5  the court found counsel in that case was not ineffective for failing to challenge CSAAS

6  testimony.  Id. at 105.

7        Because petitioner has not suggested what avenues of cross-examination were

8  neglected, he has not shown how any dereliction harmed his defense in a case where there was

9  not only the testimony of the two victims, but testimony from their older sister and mother

10  corroborating suspicious incidents with petitioner and the pretext phone call, which included

11  petitioner's failure to deny that his sexual acts against Alicia began when she was thirteen.

12        C.  <u>Failure To Raise The Statute of Limitations Issues</u>

13        This argument is specious on two levels.  First, counsel did file a motion to

14  dismiss on statute of limitations grounds, which the trial court denied.  RT 946-949; CT 420-424.

15  Second, as noted above, there was no basis for such a motion.  Petitioner's claim that counsel

16  abandoned him on the statute of limitations issue, as in <u>United States v. Cronic</u>, 466 U.S. 648

17  (1984) is frivolous.  Traverse, P.&A. at 12.

18        D.  <u>Failure To Hire A DNA Expert</u>

19        Petitioner alleges that his co-counsel Franco, who handled the questioning of the

20  criminalist who analyzed the paper towels and the officer who collected them, did not have the

21  appropriate scientific training and that his lawyers told him that no DNA expert was necessary.

22  Am. Pet., P.&A. at 19.  This conclusory argument, consisting only of a paragraph, is not a

23  sufficient basis for habeas relief.  <u>Cox v. Del Papa</u>, 542 F.3d 669, 681 (9th Cir. 2008) (conclusory

24  allegations not supported by a statement of specific facts are not sufficient for habeas relief); <u>cf.</u>

25  <u>Turner v. Calderon</u>, 281 F.3d 851, 876 (9th Cir. 2002) (reliance on properly selected expert, even

26  if not a specialist, not ineffective).

1          E.  Failure To Inform Petitioner Of Maximum And Negotiate A Plea Bargain

2          Petitioner alleges that trial counsel never told him he was facing a term of fifty-

3    eight years to life and failed to negotiate "a reasonable plea bargain."  He does not say, however,

4    he would have accepted a bargain, but rather that he "would have considered such a proposal."

5    Am. Pet., P.&A. at 19.  It is significant that petitioner does not allege he was unaware of the

6    length of the term he was facing, but rather says only that counsel did not inform him of it.

7          The Supreme Court has held that Strickland's two-part test applies to challenges

8    to attorney competence during the plea process: the first prong is "nothing more than a

9    restatement of the standard of attorney competence already set forth" while "the second, or

10   'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective

11   performance affected the outcome of the plea process."  Hill v. Lockhart, 474 U.S. 52, 58-59

12   (1985).

13         More typically, a defendant alleges that counsel failed to inform him of the

14   maximum term, which then caused him to reject a favorable plea offer.  See, e.g. United States v.

15   Day, 285 F.3d 1167, 1172 (9th Cir. 2002) ("incompetent advice resulting in a defendant's

16   rejection of a plea offer can constitute ineffective assistance of counsel").  In this case, however,

17   petitioner alleges only that had he been aware of the maximum he faced, he might consider a not-

18   defined "reasonable offer."  He has not made a sufficient showing that he would have accepted

19   any offer, particularly in the face of his rejection of the prosecution's fifteen year offer made

20   before the preliminary hearing.  CT 2.  Compare Hill, 474 U.S. at 59 (when counsel has failed to

21   convey a plea offer, petitioner shows prejudice by demonstrating he would have accepted the

22   offer rather than stand trial); Goudie v. United States, 323 F.Supp.2d 1320, 1335-36 (S.D. Fl.

23   2004) (a defendant's claim of innocence undercuts claim he would have accepted plea offer).

24   Saying only that he would have considered an offer, petitioner has fallen far short of

25   demonstrating prejudice.

26   \\\\

VI.  <u>Reasons For Consecutive Sentences Not Found Beyond A Reasonable Doubt</u> (Claim IV)

   Petitioner argues that the court imposed consecutive sentences based on findings not made by the jury and not found beyond a reasonable doubt.

   The Superior Court rejected the claim, noting that petitioner waived his <u>Blakely</u> right to a jury trial on sentencing factors.  Lodg. Doc. No. 7 at 4; <u>see</u> RT 1308-1310.  In addition, in <u>Oregon v. Ice</u>, — U. S. —, 129 S.Ct. 711, 717 (2009), the Supreme Court held that "[t]he decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law'" and rejected the defendant's claim that his consecutive sentences had been improperly imposed by the court.  There was no constitutional error.

VII.  <u>Sufficiency Of The Evidence Of Duress And Of Age</u> (Claims VI & IX)

   Petitioner was convicted of one count of violating section 269(a)(5), which then provided that a person who committed "sexual penetration, in violation of subdivision (a) of Section 289" against a child younger than fourteen is guilty of aggravated sexual assault of a child.  Former Section 289(a)(1) prohibited the penetration of the genital opening of another "when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury . . . ."  He was also convicted of one count of violating section 269(a)(1), which provided that a person who committed an act of sexual intercourse when accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" on a child under the age of fourteen is guilty of aggravated sexual assault.  The victim of these two charges, counts one and three, was Alicia.

   Petitioner argues that there is insufficient evidence of duress.  The superior court declined to address the question because petitioner had not attached the appropriate transcripts of the proceedings.  Lodg. Doc. 7 at 4.  Petitioner also argues there is insufficient evidence that any act occurred before Alicia's birthday.  This was not presented to the Superior Court, but was included in the petition filed in the Supreme Court.  Lodg. Doc. 11.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).

In Jackson v. Virginia, the Supreme Court examined the role of a habeas court in considering a challenge to the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. 307, 319 (1979) (emphasis in original).

The court continued:

> [A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.

Id. at 326.  This is because it is the jury's job to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id. at 319.  As the Ninth Circuit has recognized, the trier of fact's credibility determination is entitled to near total deference under Jackson.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds," because this court must consider the extra layer of deference to the state court's determination, as mandated by the AEDPA.  Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.  In doing so, it must apply the Jackson standard with "explicit reference to the substantive elements of the criminal offense as defined by state law."  Jackson at 324 & n.16.
\\\\

1      A.  Force Or Duress

2         Petitioner argues at length that the evidence is insufficient to show that the acts

3 against Alicia were accomplished by means of duress or threat.  Am. Pet., P.&A. at 45-53.  The

4 statute provides several means by which a jury may determine that the acts were committed

5 against the victim's will; one is duress, but another is force.  The jury was instructed in the

6 language of the statute, that it could find petitioner guilty of counts one and three if it found the

7 acts had been accomplished by means of force, violence, duress, menace or fear of bodily injury.

8 See CT 477.  The court defined the term duress for the jury, but did not define force because the

9 "term does not carry a specialized legal definition."  People v. Guido, 125 Cal.App.4th 566, 576

10 (2005) (the force necessary for a § 269 conviction is that use of force sufficient to overcome the

11 victim's will).  In this case, the court finds there is sufficient evidence of force and duress.

12 Although "there is some overlap between what constitutes duress and what constitutes force," the

13 terms are not synonymous.  People v. Pitmon, 170 Cal.App.3d 38, 50 at n.10 (1985).

14         In People v. Bolander, 23 Cal.App.4th 155 (1994), the court found sex acts

15 against a child to have been accomplished by force when the evidence showed that the defendant

16 prevented the victim from pulling his shorts back up, bent the victim over and pulled the victim

17 toward him.  Id. at 159.

18         Alicia testified that when she was thirteen, petitioner called her to his bedroom,

19 sat her on the bed, pushed her down, overcame her attempts to prevent him from pulling her

20 pants down, and then held her down as he inserted first his fingers and then his penis in her

21 vagina.  RT 86-89, 224.  Under Bolander or any common sense definition of force, petitioner

22 used force to overcome Alicia's will.

23         This evidence, in connection with the complete picture presented to the jury, also

24 establishes duress.  The established definition of duress is:

25        [A] direct or implied threat of force, violence, danger, hardship or
           retribution sufficient to coerce a reasonable person of ordinary
26        susceptibilities to (1) perform an act which otherwise would not

have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The total circumstances, including the age of the victim, and his relationship to the defendant are factors to be considered in appraising the existence of duress.

Pitmon, 170 Cal.App.3d at 50-51.  Other relevant factors are threats to harm the victim, physical control of the victim when she resists, and warning that revealing the molestation would harm the family.  People v. Cochran, 103 Cal.App.4th 8, 15 (2002), see also People v. Leal, 33 Cal.4th 999 (2004) (threat of hardship can constitute duress).

Alicia testified that all the acts of intercourse before she was fourteen were preceded by the tug of war over her pants: she would resist petitioner's removing her pants and he would try even harder to overcome her resistence.  RT 104.  In addition, petitioner, the father figure, ran the household and prescribed rules with which the girls were expected to comply.  RT 75, 322.  He also limited contact not only between the girls and their natural father but between the girls and their friends.  RT 75, 322, 381, 649.  Finally, petitioner told Alicia it would break her mother's heart.  RT 113.  This evidence of physical control coupled with a controlling relationship and a warning that Alicia's mother would be devastated by any revelation is sufficient for this court to conclude that the state court did not apply Jackson unreasonably in rejecting petitioner's challenge to the evidentiary sufficiency.

    B.  Alicia's Age

Petitioner argues that the evidence was insufficient to show that any of the acts occurred before Alicia's fourteenth birthday and that the convictions for counts one, three, five, six and seven, which include age as an element, must be reversed.

Petitioner's attack is two-fold.  First, he picks apart the trial testimony for any inconsistencies, particularly about the timing of the remodel because that event was used as a

1 reference point by the witnesses.  Second, he presents additional documentary evidence and

2 declarations from his son and daughter about the timing of the remodel.  Am. Pet., P.&A. at 70-

3 72 and Exhibits 10-20.

4        Alicia testified that the first acts of molestation occurred when she was thirteen.

5 Despite his attempts to show contradictions, petitioner has not shown that her account was

6 physically impossible.  As such, this court cannot revisit the jury's determination that Alicia's

7 account was credible.  Bruce, 376 F.3d at 958.  Petitioner's attack is not aided by the new

8 evidence he has presented:  this court must consider only evidence presented at trial and cannot

9 consider evidence outside that record in evaluating evidentiary sufficiency.  McDaniel v. Brown,

10 — U.S. — , 130 S.Ct. 665 (2010); Jackson, 307 U.S. at 323-24.

11 VIII.  Ineffective Assistance Of Appellate Counsel (Claim III)

12        The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

13 v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

14 However, an indigent defendant "does not have a constitutional right to compel appointed

15 counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

16 professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

17 (1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

18 ability of counsel to present the client's case in accord with counsel's professional evaluation

19 would be "seriously undermined."  Id..  There is, of course, no obligation to raise meritless

20 arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a showing of

21 deficient performance as well as prejudice).  In order to demonstrate prejudice in this context,

22 petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

23 appeal.  Id. at 1434 n.9.

24        Petitioner argues that appellate counsel was ineffective for failing to raise the ex

25 post facto issues discussed above, to challenge the evidence of force or duress, and to urge that

26 trial counsel was ineffective.  As this court has found that these arguments lack merit, it cannot

1    find appellate counsel ineffective for failing to raise them.

2    IX.  Restriction On Cross-Examination (Claim VIII)

3            Petitioner argues that trial counsel was prevented from asking Alicia about an

4    application for a restraining order she filed in which she said that petitioner had "tried to rape

5    me" in January, February and March 2003.  Am. Pet., Ex. 21.  The following exchange occurred:

6            Q:  You filed an action in the domestic court to get a restraining
             order against Mr. Neely; didn't you?
7
             A.  Yes.
8
             Q: Then on the date of the hearing you didn't show up, correct:
9
             MR. HIGGINS [prosecutor]: Objection.  Relevance.
10
             THE COURT: Sustained.
11

12   RT 226-227.  Petitioner argues that he was entitled to question Alicia about the discrepancies

13   between the application and her testimony, which pegged the last attempted rape as December,

14   2002 or January 2003.  He suggests that it would be extremely probative that "Alicia would

15   deliberately fabricate dates of alleged rape attempts by Petitioner and then decide not to appear at

16   the scheduled hearing."  Am. Pet., P.&A. at 59, 65.  He insists that this application for a

17   restraining order was a "documented instance of falsification of claims under oath."  RT 65.

18           A criminal defendant states a violation of the Confrontation Clause
             by showing that he was prohibited from engaging in otherwise
19           appropriate cross-examination designed to show a prototypical
             form of bias on the part of the witness, and thereby to expose to the
20           jury the facts from which jurors . . . could appropriately draw
             inferences relating to the reliability of the witnesses.
21

22   Delaware v. Van Arsdell, 475 U.S. 673, 680 (1986) (internal quotation omitted).  Even so, the

23   court may limit cross examination "based on concerns about . . . harassment, prejudice, confusion

24   of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

25   Id. at 679.  Even if an error is shown, a court must determine whether the error was harmless.  Id.

26   at 684.  In a habeas proceeding, this court must consider whether any error had a "'substantial

and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). This claim was presented to the Supreme Court, which denied it without comment. Lodg. Doc. 11.

This court cannot fault the state court's resolution of the issue. First, despite petitioner's claim, the application for the restraining order is not materially at odds with Alicia's trial testimony and would not support a claim that she was lying. Alicia did testify that the last time petitioner attempted to have sex with her was in January 2003 or December 2002, but could not specifically remember. RT 141-142. Later in her testimony, however, she mentioned the incident after the last act of intercourse when she pulled away from petitioner's grasp and petitioner asked "what do you think I'm going to do, rape you?" RT 145. In addition, there was the incident in March 2003, when petitioner called her a "cold-hearted, selfish fucking bitch" after she pulled away from him. RT 146. Arguably, the account in the application for the restraining order was little different than her trial testimony and was properly excluded.

Moreover, petitioner cannot show a substantial and injurious impact on the verdict. Although Alicia's memory was not always precise, the essence of her testimony was not undercut and would not have been by any questions about the restraining order. This coupled with petitioner's admissions during the pretext calls shows that the restriction of cross examination on this one point had no injurious effect on the jury.

X. False Or Illegally Obtained Evidence (Claim X)

Petitioner alleges that the DNA evidence admitted at trial was suspect because of the spike that suggested, in petitioner's view, a third party's DNA. He also argues that the results were unreliable because they were checked by Mark Eastman, who was later fired by the crime lab for not following protocol. He further contends that criminalist Jeff Herbert used software not licensed to him and not suitable for forensic work to finalize his report. Am. Pet., P.&A. at 77-79. He claims that he was "prejudiced by Herbert's blatant violation of established procedure as well as violation of the law." Id. at 79. He has supported his argument with a number of

33

exhibits about Eastman's firing and the DNA analysis itself.  These claims were presented to the California Supreme Court, which denied the petition without comment.[8]

A.   Petitioner's Motion To Expand The Record Regarding DNA Evidence

On March 31, 2010, the court granted petitioner leave to conduct limited discovery on his challenges to the DNA evidence.  See Order (Docket No. 25).  He has now moved to expand the record under Rule 7 Governing § 2254 Cases in U.S. District Courts, to admit new analysis of the DNA data by Keith Inman, whom he describes as a "world-renowned DNA expert."  Motion at 4 (Docket No. 33).  He cites Mr. Inman's final report on the DNA data, which concludes that "[w]ith the current state of the results for the samples, it is premature to either include or exclude Mr. Neely as the source of the DNA."  Id. at 5.  Petitioner contends that Inman's analysis "totally negates all the prosecution's DNA evidence and any and all testimony and remarks made by the prosecutor to the jury."  Id.  He also submits newly obtained documents as "additional examples of Mr. Eastman's incompetence and of his prevaricating under oath," id. at 6, and documents that he contends would impeach Herbert's competence.  Id. at 7-8.  Finally, he submits newly obtained chain of custody information related to his case that he claims "causes grave concern as to the record keeping and chain-of-custody procedures in this DNA laboratory."  Id. at 8.

Rule 7 Governing § 2254 Cases allows the district court to expand the record without holding an evidentiary hearing.  See Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2005) (citing Rule 7).  The requirements for obtaining leave to supplement the record with new evidence are the same as the requirements for obtaining an evidentiary hearing under 28 U.S.C. § 2254(e)(2).  Id.  That statutory provision limits the availability of an evidentiary hearing in a federal habeas case to the following circumstances:

---

[8] Petitioner did not present these claims about DNA evidence to the Sacramento County Superior Court or the Court of Appeal for the Third Appellate District during his state habeas process.

1
2

        If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

3

        (A)   the claim relies on –

4
5

         (i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

6
7

         (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

8
9

        (B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

10    28 U.S.C. § 2254(e)(2).

11         The U.S. Supreme Court further limited the availability of evidentiary hearings

12    (and, by extension, the ability of a petitioner to expand the record) in habeas proceedings in

13    Cullen v. Pinholster, — U.S.—, 131 S.Ct. 1388 (2011).  There, the court held that § 2254(d)(1)

14    "requires an examination of the state-court decision at the time it was made" on the same

15    evidentiary record on which the state court rendered that decision.  Pinholster, 131 S.Ct. at 1398.

16    "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review.  If a claim has

17    been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the

18    limitation of § 2254(d)(1) on the record that was before that state court."  Id. at 1400.  The

19    Supreme Court went on to explain the remaining role of evidentiary hearings under § 2254(e)(2):

20
21
22
23
24

        Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief.  For example, not all federal habeas claims by state prisoners fall within the scope of § 2254(d), which applies only to claims "adjudicated on the merits in state court proceedings."  At a minimum, therefore, § 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court.

25    Id. at 1401.

26    \\\\

35

1       Under Pinholster, then, the court can grant petitioner's motion to expand the

2  record with new evidence only if it relates to a claim that a state court did not previously decide

3  on the merits.  Petitioner alleged that the DNA evidence presented at trial was "false and/or

4  illegally created" in the petition he filed with the California Supreme Court.  See Lodged Doc. 3

5  at 77-82A.  The California Supreme Court issued a one-sentence denial of the entire petition on

6  Jun 11, 2008.  See Am.Pet. at unnumbered page 9.  Although no state court has given a reason

7  why the claim challenging the DNA evidence has no merit, the California Supreme Court's

8  summary denial is considered, as a matter of law, a merit-based decision that places the claim

9  within the parameters of § 2254(d) and the recent ruling from the Supreme Court in Pinholster.

10  See Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 784-85 (2011) (holding that "§ 2254(d)

11  does not require a state court to give reasons before its decision can be deemed to have been

12  'adjudicated on the merits'").  Therefore, the court is constrained by Pinholster from considering

13  plaintiff's additional evidence.  His motion to expand the record to include newly obtained

14  evidence in support of his federal habeas petition must be denied, and the court should review the

15  claim of "false or illegally created" DNA evidence solely on the record generated in state court.[9]

16      B.  Petitioner's Claim of "False or Illegally Obtained Evidence" Under § 2254(d)

17       A conviction violates the Fourteenth Amendment if it is obtained by the use of

18  perjured testimony the prosecutor knows to be false.  See Napue v. Illinois, 360 U.S. 264 (1959).

19  It is petitioner's burden to demonstrate that the challenged testimony was false, that the false

20  testimony was material, and that the prosecutor knew the testimony was false when it was

21  presented.  Schad v. Ryan, 606 F.3d 1022, 1037 (9th Cir. 2010); Akrawi v. Booker, 572 F.3d

22

23       [9] In his motion to expand the record, petitioner asserts in passing that some of the newly
obtained evidence "bolsters his claim of ineffective assistance of counsel against both Ms.
24  Franco and Mr. Virga" for their failure to retain a DNA expert who could rebut the prosecution's
evidence and expert testimony.  Mot. at 4.  Because petitioner alleged that claim during the state
25  habeas process, and because it was adjudicated on the merits in the California Supreme Court's
denial, under Pinholster the court cannot consider any newly obtained evidence of the claim now.
26  See Lodged Doc. 11 at 10-13, 17.

1  252, 265 (6th Cir. 2009) ("a false-testimony claim is cognizable in habeas because the deliberate

2  deception of jurors by the presentation of known false testimony is incompatible with

3  rudimentary demands of justice").  A prosecutor has the duty to correct false testimony, even if it

4  was not intentionally submitted.  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002).

5          A conviction may violate the Fourteenth Amendment if based on unreliable

6  evidence, but it is petitioner's burden to show that the evidence "'is almost entirely unreliable

7  and . . . the factfinder and the adversary system will not be competent to uncover, recognize and

8  take due account of its shortcomings.'"  Id. at 956, quoting Barefoot v. Estelle, 463 US. 800, 899

9  (1983).  To prevail, a petitioner must show that the error rendered his trial "so arbitrary and

10  fundamentally unfair that it violated federal due process."  Mancuso, 292 F.3d at 956 (internal

11  quotation omitted).  A court generally will not find a due process violation from the admission of

12  evidence when the "evidentiary issue was fully and competently aired" in the state court.  Moore

13  v. Gibson, 195 F.3d 1152, 1167 (10th Cir. 1999).

14          Petitioner has not shown that the California Supreme Court committed an

15  unreasonable application of law on either aspect of his claim that the DNA evidence was false or

16  improperly fabricated.  Nothing in the state court record shows that Herbert's testimony about the

17  results of the DNA tests were false or that the prosecutor was aware of any falsehood.

18  Furthermore, petitioner's exhibits from the record do not show that the DNA evidence was

19  "almost entirely unreliable."  It is true that there are some anomalous findings in the DNA

20  analysis, but these were fully explored during cross-examination and closing argument.[10]  See

21  RT 765-774, 1060-1075.  There has been no showing that the anomalies the jury heard about

22

23          [10] It is also true that Mark Eastman, who performed the technical review of Jeff Herbert's
    results, was later fired for failing to follow protocol.  Am. Pet., Ex. 23.  However, petitioner has
24  not pointed to anything in the state court record showing that Eastman had anything to do with
    the actual testing.  As Herbert testified on cross-examination, the technical reviewer does not re-
25  test the material independently and does not give an independent interpretation of the data.  RT
    764.  Petitioner has not linked Eastman's technical review to the actual testing of the DNA and
26  so cannot link Eastman's problems to the test results in this case.  He has not borne his burden of
    showing from the state court record the DNA evidence was "almost entirely unreliable."

1  rendered his trial "so arbitrary and fundamentally unfair that it violated federal due process."

2  Mancuso, supra.  There was ample testimony from witnesses, detailed above, that was unrelated

3  to the scientific evidence and that could be the basis of a reasonable juror's conclusion that

4  petitioner was guilty of the crimes charged.

5          Accordingly, IT IS HEREBY ORDERED that the motion to expand the record

6  (Docket No. 33) is denied.

7          IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

8  habeas corpus be denied.

9          These findings and recommendations are submitted to the United States District

10  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

11  one days after being served with these findings and recommendations, any party may file written

12  objections with the court and serve a copy on all parties.  Such a document should be captioned

13  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14  shall be served and filed within fourteen days after service of the objections.  The parties are

15  advised that failure to file objections within the specified time may waive the right to appeal the

16  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17   Dated: October 24, 2011

18
                                      _____
19                                      CAROLYN K. DELANEY
                                      UNITED STATES MAGISTRATE JUDGE
20

21
   3
22   neel1416.157

23

24

25

26